[No. 30633. Department One. December 3, 1948.]

CLARA DEWEY GORRIEN, *Appellant*, v. E. W. JAMISON *et al.*, *Respondents.*[1]

[1]Reported in 200 P. (2d) 488.

*John T. Raftis*, for appellant.

*Richard S. Munter* and *Justin C. Maloney*, for respondents.

BEALS, J.—The plaintiff, Clara Dewey Gorrien, by her complaint, sought to quiet her title to mining property in Stevens county, Washington, particularly described as an undivided one-third interest in an option contract granting a right to purchase property, consisting of five unpatented mining claims, situated in section 26, township 29 north, range 40 east W. M.

The following statement is condensed from the evidence introduced at the trial:

During "the 1920s," John Gorrien and Clara Dewey Gorrien, husband and wife, sold the mining property, referred to above, to persons named Siegmann, who resided in Minneapolis, Minnesota, where Mr. and Mrs. Gorrien, at that time, also resided.

March 11, 1942, the Siegmanns leased the properties to Tom Young, A. R. Mullin, and John Gorrien, referred to as of Minneapolis, with the right to mine the property, a royalty upon the net selling price of minerals mined to be paid to the lessors. The contract also granted to the lessees an option to purchase the property for twenty-five thousand dollars, the lessees to pay at least one hundred twenty-five dollars November 1, 1942, and the same amount May 1st and November 1st of each year for four years, and, thereafter, the balance at twelve hundred fifty dollars a year. The contract provided for forfeiture of the lessees' rights if the payments called for by the contract were not made when due.

A few days after the execution of the contract, Gorrien, Young, and Mullin came to the state of Washington to develop the mining property. During the summer of 1942, they executed a conditional assignment of the contract and option to Western Knapp Engineering Company, herein-

after referred to as Knapp. The mining properties were principally valuable because of deposits of zinc ore, and Knapp conducted mining operations thereon until March 11, 1944, when Knapp abandoned the contract and returned the property to its assignors.

Meanwhile, June 1, 1943, John Gorrien had died; his widow having been appointed administratrix of his estate a few days thereafter, she being, apparently, his sole heir.

Immediately after Knapp abandoned the mining claims, Young and Mullin, who were themselves unable to finance the operation of the property, attempted to interest other parties therein. The president of the Hecla Mining Company had previously sent one of the company's engineers to examine the claims and, at the request of Young and Mullin, made some further investigation, a short time thereafter informing Young that the Hecla company was not interested. Other vain attempts were made to procure a purchaser.

E. W. Jamison and T. Higginbotham, the defendants in this action, were conducting zinc mining operations, including an operating mill, not far from the mining claims referred to above.

Mr. Mullin, who had been in the employ of Knapp, after that company ceased to operate the mining claims with which we are here concerned, was employed by Jamison and Higginbotham, and, about April 1, 1944, informed Mr. Young that Mullin's present employers might purchase the mining lease and option, paying twenty-five hundred dollars for each one-third interest therein.

Mullin and Young then called on Mrs. Gorrien, telling her that, in their opinion, if such an offer were made, it should be accepted. While the three were together, Mrs. Gorrien telephoned the president of the Hecla Mining Company, asking him if he would pay fifteen thousand dollars for the option contract and, when he displayed no interest in that figure, asked if he would pay ten thousand dollars, but even the suggestion of that price found no response.

Mullin and Young then called on Mr. Higginbotham, who stated that he would be interested in a fifteen-day option

on the property at seventy-five hundred dollars (twenty-five hundred dollars each to Mullin, Young, and Mrs, Gorrien). An option was prepared, whereby Mrs. Gorrien and Mr. Young, in consideration of two hundred dollars paid, granted a fifteen-day option to Higginbotham and Jamison to purchase their respective shares of the property for five thousand dollars, the balance of forty-eight hundred dollars to be paid on or before April 16, 1944. Mullin and Young then returned to Mrs. Gorrien's apartment with the option agreement and two one-hundred-dollar checks. Young signed the agreement and Mrs. Gorrien also signed it, receiving her check.

April 14th, Jamison and Higginbotham having decided to exercise their option, Mr. and Mrs. Mullin assigned their interest in the mining lease and option, signing and acknowledging a mining deed and a quitclaim deed. The following day, Mr. and Mrs. Young executed similar conveyances.

As Mr. Gorien's estate was still in course of probate, the conveyance of Mrs. Gorrien's interest could not then be accomplished, and, April 16th, Mullin, Young, and Jamison called upon Mrs. Gorrien, at which time she and Young signed a written extension of the option to April 22, 1944, which was endorsed on the fifteen-day option agreement. This was the first time Mrs. Gorrien met Mr. Jamison. She never met Mr. Higginbotham.

April 17th, one of the attorneys for Jamison and Higginbotham telephoned Frank J. Blade, Esquire, Mrs. Gorrien's attorney, who was in charge of the probate of her husband's estate, and it was agreed that the balance of the purchase price for Mrs. Gorrien's interest should be placed in escrow until the entry of a decree of distribution.

On the afternoon of the same day, Mrs. Gorrien called at her attorney's office, where, after a short time, they were met by Mr. Jamison and his attorney, on which occasion Mrs. Gorrien stated that she did not like to make the sale because she believed that the price which she was receiving was less than the value of the property. Mr. Jamison stated that he would pay an additional one hundred dollars to Mrs. Gorrien, who then signed the assignment of the

option and a quitclaim deed, accepting Mr. Jamison's check for the additional one hundred dollars. She received a check for $517, and her counsel received a check for $483, with which to pay debts owed by Mr. Gorrien's estate and the expenses of administration. The parties then went to a bank and placed the documents in escrow, together with Mr. Jamison's check for fifteen hundred dollars, the balance due Mrs. Gorrien, according to her agreement to sell the property for twenty-six hundred dollars, the escrow to be accomplished upon distribution of Mr. Gorrien's estate.

April 28th, Mrs. Gorrien wrote a long letter to Richard S. Munter, Esquire, one of the attorneys for Jamison and Higginbotham, stating that, due to her immediate need of funds, her two associates, taking advantage of that fact, had practically forced her to sign the option. After other complaints against Messrs. Young and Mullin, the letter continued:

" . . . rather than endure the strain of bringing the case out in the open, I will agree to a nominal addition—which can be in the form of a monthly amount—or a specific sum. Five thousand cash—or $125.00 per month for five years.

"I wish to handle this personally—if possible—and by correspondence—as my physical condition makes trying interviews too taxing. Please let me hear within the week —as I must make definite plans."

Mr. Munter promptly replied to this letter, stating that, as Mrs. Gorrien had an attorney, who was representing her husband's estate, he did not wish to discuss the matter with her, save in the presence of her counsel. Mr. Munter's letter continued as follows:

"My such inability to discuss the matter with you does not require that I abstain from telling you that I have no question as to the fair dealing and good faith of my clients in this matter. Only time and developments will tell whether you folks made a good deal or a bad deal, but time and developments will not change the fact that the deal was made fairly and hence is valid and binding on all parties thereto.

"I am sending a copy of your letter to Messrs. Higginbotham and Jamison for their information."

May 19th, the decree of distribution was entered in Mr. Gorrien's estate, and, on or about May 26, 1944, Mrs. Gorrien went to the bank which was acting as escrow holder and withdrew the fifteen hundred dollars which was there held in escrow, the matter having reached a stage satisfactory to the purchasers.

December 5, 1945, Mrs. Gorrien verified her complaint in this action, O. C. Moore, Esquire, appearing as her attorney, naming E. W. Jamison and T. Higginbotham as defendants. The complaint was filed in the superior court for Stevens county December 11, 1945. In effect, plaintiff's complaint asked that her title to an undivided one-third interest in the option contract, above referred to, be quieted in her, as against the defendants.

Later, complying with the defendants' demand for a bill of particulars, plaintiff furnished copies of the instruments which showed Mr. Gorrien's title to the interest which she claimed, and incorporated in her reply (filed later) those which disclosed her dealings with the defendants.

By their answer, defendants admitted their claim to the property, pleading affirmatively that, on or about April 14, 1944, plaintiff, for a valuable consideration, sold and conveyed to defendants all of her right, title, and interest in and to the property. Defendants prayed for dismissal of the action, with prejudice.

Plaintiff filed an amended reply to the affirmative defense contained in defendants' answer, alleging that her co-owners, Messrs. Young and Mullin, entered into a conspiracy with other persons unknown to plaintiff to defraud the plaintiff and deprive her of her interest in the mining property; that the defendant Jamison falsely represented to plaintiff that he had purchased and acquired the interests of Young and Mullin in the property, and that the conveyances of her interest in the mining claims were, by defendants, fraudulently procured from plaintiff.

Early in the trial, in denying defendants' motion for judgment on the pleadings, the trial judge stated that he would consider the complaint as asking for a rescission and an accounting.

The action was tried to the court, and, at the close of plaintiff's evidence, the action was dismissed, upon defendants' motion for judgment of dismissal, with prejudice, the motion having been based upon the ground that the evidence failed to show that plaintiff was entitled to any relief.

Plaintiff moved for a new trial and to vacate the judgment of dismissal and reopen the case, upon the ground, *inter alia,* of newly discovered evidence. All of her motions having been denied, the plaintiff appealed to this court, assigning error upon the entry of the judgment dismissing the action; upon the refusal of the court to reopen the case for further testimony; upon the denial of appellant's motion for reconsideration of the court's decision; and upon the court's refusal to grant appellant's motion for a new trial.

When the case was called for trial, appellant was represented by O. C. Moore, who had drafted the complaint, and her present counsel, John T. Raftis. After the trial, Mr. Moore, because of illness, ceased to represent appellant.

Appellant is a singer and teacher of voice, and resides in Spokane. She knew nothing about mining operations and had no technical knowledge of the value or operation of the mining claims in which she owned an interest. She testified that, during the period of the conduct of negotiations for the sale of the property, her means were limited, she was nervous and ill, and was frequently attended by a nurse.

Mrs. Gorrien testified that she and her husband were formerly residents of Minneapolis, where Mr. Gorrien had been in the hotel business for approximately fifteen years prior to their removal to the state of Washington in March, 1941; that the purpose of their removal to this state was to develop the mining property here in question; that her husband, until his death in June, 1943, had attended to all details concerning the management of their interest in the mining property. In June, 1943, the property was being operated by Knapp, and, while Knapp was in charge of the property, her husband, and, later, his estate, received two hundred dollars per month, these payments, of course, ceas-

ing when Knapp abandoned the project. She also testified concerning matters stated in the first portion of this opinion.

Concerning what occurred shortly before the transaction which she here seeks to avoid, appellant testified that Messrs. Young and Mullin gave her the impression that the property was without value and was not salable; that, when her associates told her of respondents' offer for the property, they represented that the sum offered by respondents for the option was "velvet," and that respondents would probably not exercise their option to purchase. She testified that, at this time, she was nervous and disturbed because she needed money and nothing was being accomplished toward realizing from the property. She stated that, when she signed the option in respondents' favor, she did not know that she had thereby agreed to sell the property.

Upon cross-examination, appellant admitted signing the various documents above referred to, it appearing that her recollection of some of the events concerning which she testified was confused. She admitted that she had acknowledged the instruments before the notary who certified that they were so acknowledged, and that she went with the other parties to the bank and was present when the papers were there placed in escrow. She admitted that, later, she went to the bank and withdrew the money which was there on deposit, in escrow, for her. Concerning this matter, the following appears in the course of her cross-examination, as disclosed in the statement of facts:

"Q. So, then, when you drew this money down in May, you didn't know you had been defrauded? A. Well, there was a question about the whole transaction all the time in my mind. Q. There was a question, but you didn't think you had been defrauded at that time? You just had a question in your mind, is that it? A. I don't know as there is any difference. It was in the back of my mind that this thing had been put over on me. Q. In other words, you mean you just felt you never got enough for it; you felt that before you signed the option, you felt it afterwards; you felt it when you signed the assignment; you felt it when you drew down the money. You always had that same feeling, isn't that it? A. Yes."

Frank J. Blade, Esquire, called as a witness for appellant, testified that he had represented appellant in probating Mr. Gorrien's estate. The witness testified that he knew nothing of the present or potential value of the interest in the mining claims which belonged to the estate, save that the appraisers valued this interest at eight thousand dollars. He stated that, April 15, 1944, Messrs. Young and Mullin met him at the courthouse and told him that respondent Jamison wished to purchase appellant's interest in the claims, and they asked that the witness urge appellant to accept the offer. This was the first the witness had heard of a proposed sale. Mr. Blade told Young and Mullin that he would not advise appellant one way or another; that he represented appellant only as her attorney in the probate of the estate, and that he knew nothing concerning the value of the properties. He further testified that he did not advise Mrs. Gorrien concerning the proposed sale or in any way endeavor to influence her to either accept or reject the offer.

The witness testified that, April 17th following, Mr. Munter telephoned him, requesting that he (Mr. Munter) and Mr. Jamison meet appellant at the witness's office; that the parties met there that afternoon, and that Mr. Munter brought with him certain documents which he had prepared in connection with the transfer of Mrs. Gorrien's interest in the properties from her to respondents, and also escrow instructions to the Old National Bank. The witness stated that he read the documents, and that, in order to avoid any possible later criticism that he had advised appellant one way or another, he asked Mrs. Gorrien

" . . . if she understood what these documents were for and what they would do if she signed them. And she said yes, but she felt that it was unfair, that she had been sold out by Mr. Mullin and Mr. Young; she hadn't any money to carry on with, and the Western Knapp Engineering Company having cancelled their lease from which she had been receiving $200 a month advance royalties, it left her so that she was penniless and she didn't know what else she could do. Well, she felt that Mr. Young and Mr.

Jamison, and she expressed it several times there, had high-pressured her and left her in the lurch."

Immediately after the latter statement, Mr. Blade corrected his testimony by saying that he intended to say "Mr. Young and Mr. Mullin." The witness then continued:

"I turned to Mr. Jamison and I asked him: 'As I understand it, you have already bought out Mr. Young and Mr. Mullin completely?' And he answered, 'Yes, I have.' And then we discussed how long it would take. It would take at least a month to publish notice of the final hearing in the estate and to have the decree entered. And Mrs. Gorrien remarked that that was another hardship on her to be compelled to stay there and live for another month, and then Mr. Jamison indicated that he would add another hundred dollars to assist her through that additional month of living expense if that would satisfy her, and she felt, well, she couldn't do anything else. MR. MUNTER: Don't give us her feelings. A. She said that she couldn't do anything else about it, she was in no position to do anything else, and she took the additional hundred dollars and she signed the document."

On cross-examination, the witness stated that, before Messrs. Munter and Jamison arrived at his office, appellant had informed him that she had already granted an option for the purchase of her interest in the property.

The escrow papers were then signed, and, when the decree of distribution was entered in the estate, the witness took a certified copy thereof and, with appellant, went to the bank, where she deposited the certified copy of the decree with the escrow department and received the bank's check for fifteen hundred dollars. This transaction terminated Mr. Blade's services and his connection with this entire matter.

Appellant called Mr. Young as a witness, and Messrs. Jamison and Higginbotham as adverse witnesses. As stated by the trial court, the testimony of these witnesses disclosed nothing which materially aided appellant's case.

Appellant's counsel suggests that, when Mullin and Young gave respondents options for the purchase of their interests in the property, respondents became appellant's

partners. While, when these options were granted, respondents did become potential co-owners of the property, they did not become partners with appellant in the project. Of course, they, and Messrs. Young and Mullin, owed to appellant the duty of being frank and honest in their dealings with her. They were entitled to persuade her to sign the option, as long as they told her the truth, as they understood it, and did not endeavor to mislead her concerning the then present situation.

The trial court referred to the testimony of the witness Young, saying that he testified fully and frankly, the court having been favorably impressed by his frankness. The trial court also stated that the evidence did not contain even a suggestion that either Mr. Young or Mr. Mullin received any more for his interest in the property than was paid to appellant. The testimony supports the trial court's opinion in this and other respects. From appellant's testimony, it appears that she was in great need of money.

In its oral opinion, in ruling upon respondents' motion to dismiss, the trial court stated that appellant had failed entirely to establish fraud on the part of respondents, or any conspiracy, as she alleged in her complaint, on the part of Messrs. Young and Mullin with respondents. The court observed that appellant, in her testimony, was inconsistent, and that "she was mistaken in several respects."

The letter that appellant wrote to Mr. Munter indicates that she was willing to sell, but wanted more money, suggesting an additional five thousand dollars. As above stated, there is evidence to the effect that, when she telephoned the president of the Hecla Mining Company, she asked if he would be willing to pay ten thousand dollars for the three interests in the lease and option. That amount would be only twenty-five hundred dollars more than respondents paid. Of course, appellant did not then say that she would sell on that basis, but it indicates that, at that time, she was at least considering a sale for the amount mentioned.

The trial court did not err in granting respondents' motion for dismissal of the action, with prejudice.

There is one other matter which requires consideration. Appellant moved that the case be reopened for further evidence or, in the alternative, for a new trial. There was some evidence concerning letters from "Butler Brothers," of Minneapolis, inquiring about the property. One of these letters was, apparently, written to Mr. Mullin and another to appellant. Appellant testified that she had this letter at her home in Spokane, but it was never produced, nor was any evidence given as to its contents, nor was it referred to in her post-trial motions. Appellant testified that Mr. Mullin did not mention to her the letter which he received, and that he answered it without consulting her. Appellant's counsel stated merely that the letter showed "an interest in the purchase of this property." Apparently, it was anticipated that appellant would offer the letter which she received in evidence, prior to the close of the trial, but it was never produced. No showing whatever was made concerning the contents of the letter from Butler Brothers which appellant received, and that matter is disregarded.

Appellant filed a "motion for reconsideration or for a new trial," which was based upon the record made in the case, and a subsequent motion to vacate the judgment of dismissal, which was based upon an affidavit of appellant's present counsel. Later, appellant's counsel, in another affidavit, stated that, after the court had announced his oral decision, respondents "entered into a contract of sale involving the property covered by this action, along with other mining property" for a total price of three hundred thousand dollars.

March 4, 1948, the trial court denied appellant's motions to vacate the judgment or reconsider its decision.

The fact that respondents sold the mining claims, in which appellant had owned a one-third interest, and other undescribed property for a large sum of money, constituted no sufficient ground for reopening the case or granting a new trial. It was a mere *ex parte* statement, conveying no information whatever as to the "other mining property,"

which, if such a sale was, in fact, made, may have been the principal consideration for the sale.

Finding no error in the record, the judgment appealed from is affirmed.

MALLERY, C. J., STEINERT, SIMPSON, and HILL, JJ., concur.

'Reported in 200 P. (2d) 467.